# MERCHANDISING AGREEMENT
# SUBLICENSE AGREEMENT SUMMARY

LICENSED PROPERTY: STAR WARS (as further described in Schedule A)
DATE OF AGREEMENT: As of October 28, 2004
CONTRACT NUMBER: 121677

PARTIES:

Licensor: HASBRO, INC. and HASBRO INTERNATIONAL, INC.
Address: 1027 Newport Avenue
Pawtucket, Rhode Island 02862-1059 U.S.A.
Telephone: 401-727-5617
Fax: 401-727-5595

and

Licensee: OVERBREAK, LLC
Address: 9420 Chivers Avenue
Sun Valley, California 91352
Telephone: 818-252-3425
Fax: 818-252-3892

GRANT OF LICENSE:

(a) Licensed Articles: Non-motorized flying items, filled with helium or air, namely, (1) thirty six (36) inch diameter HoverDisc ™ items, with and without lighted features (2) twenty six (26) inch diameter Trick Disc ™ items, (3) Hover Spheres, (4) Hoverbands, (5) Hover Rockets, and (6) Hover Tubes.

(b) Territory: United States, and Canada, their respective territories and possessions, Australia and New Zealand, the European Union, Mexico, the countries of Asia and the Middle East consisting of China (including Hong Kong and Macau), Japan, South Korea, North Korea, Mongolia, Taiwan, the Russian Federation, Afghanistan, Bangladesh, Bhutan, India, Iran, Kazakhstan, Kyrgyzstan, Maldives, Nepal, Pakistan, Sri Lanka, Tajikistan, Turkmenistan, Uzbekistan, Brunei, Cambodia, Indonesia, Laos, Malaysia, Myanmar (Burma), Philippines, Singapore, Thailand, Timor-Leste, Vietnam, Armenia, Azerbaijan, Bahrain, Cyprus, Georgia, Iraq, Israel, Jordan, Kuwait, Lebanon, Oman, Qatar, Saudi Arabia, Syria, Turkey, United Arab Emirates, and Yemen, and Argentina, Brazil, Chile, Colombia, Costa Rica, Dominican Republic, El Salvador, Guatemala, Honduras, Nicaragua, Panama, Paraguay, Peru, Bolivia, Ecuador, Uruguay, Venezuela and the Caribbean (namely, Anguilla, Antigua, Aruba, Barbuda, Barbados, British Virgin Islands, Cayman Islands, the Dutch Antilles, Grenada, the Grenadines, Guadeloupe, Martinique, Nevis, St. Barts, St. Lucia, St, Kitts, St. Martin, St. Vincent, Tobago, and Turks and Caicos (collectively, "Latin America"). It is understood that Hasbro, Inc. shall be deemed "Licensor" hereunder with respect to all rights and obligations of Licensor in the United States, its territories, and possessions, and Hasbro International, Inc. shall be deemed "Licensor" hereunder as to all rights and obligations of Licensor elsewhere in the Territory.

 © 2004 Hasbro, Inc. All Rights Reserved. This document shall not be deemed an offer and shall not be binding unless signed by all named parties.

Channels of Distribution: Mass merchandisers, toy discounters, toy store franchisers and chains, independent stores specializing in products that are similar to the Licensed Articles, collectors' stores, supermarkets, mid-level department stores, upscale department stores, warehouse and price clubs, drug stores/convenience stores, comic book stores, mall based carts and kiosks, and Internet retailers (provided that such Internet sales shall be restricted to sales to residents of the Territory for shipment only to addresses in the Territory), and specifically excluding amusement parks, carnivals and use as premiums.

(c) Term: November 15, 2004 through December 31, 2006.

TERMS OF PAYMENT:

(a) Royalty Rate: Thirty percent (30%) of Net Sales (except that, in the event of FOB Sales, the royalty rate is increased by two (2) percentage points).

(b) Terms of Payment:

| Total Royalty Guarantee | Advance Royalty Payment | Balance Due Dates |
|---|---|---|
| U.S. $1,000,000.00 | U.S. $150,000.00 | U.S. $350,000.00 due by 06/15/05<br>U.S. $250,000.00 due by 07/01/06<br>U.S. $250,000.00 due by 12/01/06 |

The Advance Royalty Payment is due and payable upon Licensee's signing hereof and the balance of the Total Royalty Guarantee is due and payable as set forth above.

INITIAL ON SALE DATE: The first three types of Licensed Articles -- (1) thirty six (36) inch diameter HoverDisc ™ items, with and without lighted features, (2) twenty six (26) inch diameter Trick Disc ™ items, (3) Hover Spheres -- shall be first offered for sale and shipped to customers not later than April 2, 2005. Notwithstanding Paragraphs 10(a), 12(a) and 16(a) of the Basic Terms to the contrary, Licensor acknowledges that the other three types of Licensed Articles are under development and may or may not be offered for sale by Licensee during the Term.

REQUIRED NOTICES: "STAR WARS is a trademark of Lucas Films, Ltd. All Rights Reserved. Used under Authorization. © [year of first publication]. Under sublicense from Hasbro Properties Group."

SPECIAL CONDITIONS:

1. This Agreement is subject to the prior approval of Lucas Licensing, Ltd. and shall be of no force or effect unless and until such approval is obtained. In addition, the provisions of Attachment A are hereby incorporated into this Agreement; in the event of any conflict between

the provisions of Attachment A and the terms of this Sublicense Agreement Summary or the License Agreement Basic Terms, the provisions of Attachment A shall govern.

2. In the mass merchandisers and toy Channels of Distribution, the Licensed Articles shall not be sold for placement in the action figure aisle or on licensed counters. In the mass merchandisers and toy Channels of Distribution, placement of the Licensed Articles in any feature space secured in part by Lucas Licensing, Ltd. and/or Licensor shall be only with Licensor's consent, which may be granted or withheld in Licensor's sole discretion, and may be conditioned, without implied limitation, on Licensee agreeing to share in any POS or other costs associated with the featured space.

3. Licensee shall obtain any artwork and/or style guides from Licensor.

4. With respect to distribution of Licensed Articles in Japan only, Licensee shall first offer to Tomy Japan the right to act as Licensee's distributor, on terms that are as favorable as those that Licensee would offer to any other distributor. Only if Tomy Japan, in its sole discretion, declines in writing to act as Licensee's distributor in Japan, then Licensee may choose another distributor for the Licensed Articles in Japan. Licensee shall give Tomy Japan a commercially reasonable amount of time to communicate in writing its declination.

The aforesaid terms and conditions, including Attachment A, and those set forth in the attached License Agreement Basic Terms, attached hereto and incorporated herein by reference, shall only be binding upon Licensor provided that Licensee signs and returns the Sublicense Agreement Summary and Licensor countersigns same.

AGREED TO AND ACCEPTED BY:

HASBRO, INC.

By: [signature]
Date: APR 12 2005

OVERBREAK, LLC

By: [signature]
Date: 4-5-05

HASBRO INTERNATIONAL, INC.

By: [signature]
Date: APR 12 2005

JANE RITSON-PARSONS
President
Hasbro Properties Group
HASBRO, INC.

# SUBLICENSE AGREEMENT
# BASIC TERMS

THIS AGREEMENT is by and between HASBRO, INC., a Rhode Island corporation with its principal place of business at 1027 Newport Avenue, Pawtucket, Rhode Island 02862-1059 U.S.A. and HASBRO INTERNATIONAL, INC., at the same address (hereinafter collectively called "Licensor") and the Licensee named in the Sublicense Agreement Summary to which these Basic Terms are attached.

WITNESSETH:

WHEREAS, Licensor has rights to the name, characters, symbols, designs, likenesses and visual representations of the Licensed Property, as defined in the Sublicense Agreement Summary, and the copyrights and trademarks thereon, as set forth on Schedule "A" hereunto annexed (which names, characters, symbols, designs, likenesses and visual representations and each of the individual components thereof shall hereinafter jointly be called the "Name"); and

WHEREAS, Licensee desires to utilize the Name upon and in connection with the manufacture, sale and distribution of articles hereinafter described.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and for other good and valuable consideration, the parties do hereby agree as follows:

1. GRANT OF LICENSE

(a) Licensed Articles. Upon the terms and conditions hereinafter set forth, Licensor hereby grants to Licensee and Licensee hereby accepts the right, license and privilege of utilizing the Name solely upon and in connection with the manufacture, sale, and distribution of the specific articles listed in the Sublicense Agreement Summary (hereinafter referred to as the "Licensed Articles"), and no other articles of any kind, and Licensee shall only use such trademarks as may be approved, in the manner approved, when the Licensed Articles are submitted for approval. The definition of the Licensed Articles shall be strictly construed. Notwithstanding anything herein to the contrary, and without expanding Licensee's rights hereunder in any way, Licensee shall not have the right to use the "Hasbro" logo, the "MB" logo, the "Parker Brothers" logo, the "OddzOn" logo, or the "Kenner" logo without Licensor's express prior written approval.

(b) Territory. The license hereby granted extends only to the area listed in the Sublicense Agreement Summary ("Territory") and only to sales through the Channels of Distribution, also as defined in the Sublicense Agreement Summary. Except to the extent that the following prohibition is contrary to any local laws, Licensee agrees that it will not make or authorize any use, direct or indirect, of the Name in any other area, or outside the Channels of Distribution, and that it will not knowingly sell Licensed Articles to persons who intend or are likely to resell them in any other area or outside the Channels of Distribution. Notwithstanding this territorial limitation however, Licensee shall have the right to manufacture the Licensed Articles (or have the Licensed Articles manufactured for it as provided in Paragraph 20 hereof) outside the licensed Territory, provided, however, that the Licensed Articles are sold and distributed only within such licensed Territory.

(c) Term. The Term of the license hereby granted shall be effective as shown in the Sublicense Agreement Summary, unless sooner terminated in accordance with the provisions hereof.

2. TERMS OF PAYMENT

(a) Rate. Licensee agrees to pay to Licensor, as royalties, a sum equal to that shown in the Sublicense Agreement Summary on all Net Sales by Licensee or any of its affiliated, associated or subsidiary companies of the Licensed Articles. "Net Sales" shall be equal to one hundred percent (100%) of all gross amounts derived by Licensee from the sale of each and every Licensed Product hereunder, less only: (a) any and all reasonable and actual trade or promotional discounts and allowances (however characterized) which are shown on an invoice or reflected in a credit memo or otherwise documented (e.g., for so-called "free goods") and which do not exceed in their totality seven and one-half percent (7.5%) of the total amount shown on the invoice; and (b) returns supported by credit memos actually issued to a Customer, provided that such returns may not exceed three percent (3%) of the total invoiced amount (regardless of whether such returns are the result of return policies, defective products, product warranties, stock balancing, price protection or any other provision or obligation) and any such returns in excess of three percent (3%) which are subsequently resold will not bear any Royalty with respect to the Net Sales associated with such subsequent sale except to the extent the applicable Royalty on Net Sales of any such returns (in excess of the three percent (3%) returns cap referred to hereinabove) exceeds the applicable Royalty on the original Net Sales thereof. Net Sales shall not be reduced in any other way not specified above and there shall be no other deductions of any kind whatsoever including, but not limited to, deductions for cash payment discounts or freight discounts or any allowances or reserves of any kind, including for uncollectible or uncollected amounts (whatever the reason), so-called "free goods", any cost incurred in connection with the manufacture, distribution or sale of a Licensed Product, any general or administrative costs of any kind, any tariffs, duties or other custom fees, any freight, insurance or other transportation costs, or any other costs or expenses of any nature. A "sale" shall be defined to occur for a specific Licensed Product when the first of any of the following events occurs: (i) the date of the invoice for such Licensed Product actually issued by Licensee to a customer; (ii) the date of the shipment of such Licensed Product to a customer of Licensee; or (iii) the date payment is received in respect of such Licensed Product by Licensee from a customer. Any and all other costs and expenses incurred in the manufacture, sale, distribution or exploitation of the Licensed Articles, or otherwise incurred by Licensee, shall be paid by Licensee, and no such costs or expenses shall be deducted from any royalty payable to Licensor. With respect, however, to all sales of the Licensed Articles which are effectuated direct to customers for resale within the Territory where the terms of the sales to such customers are f.o.b. shipping point outside the Territory ("FOB Sales"), the said royalty shall instead be increased by the number of percentage points over the then-applicable rate for other sales of the Licensed Articles as may be indicated on the Sublicense Agreement Summary attached hereto.

(b) Terms of Payment. Licensee agrees to pay to Licensor not less than the Total Royalty Guarantee as royalties for sales of the Licensed Articles during the Term hereof, and an Advance Royalty Payment applicable to said Total Royalty Guarantee equal to the sum as shown in the License Agreement Summary. The Advance Royalty Payment and the balance of the Total Royalty Guarantee shall be payable as shown in the License Agreement Summary. No part of such amounts shall in any event be repayable to Licensee.

(c) Periodic Statements. Within thirty (30) days after the initial shipment of the Licensed Articles, and promptly on the thirtieth (30th) day of the month following each calendar quarter thereafter, Licensee shall furnish to Licensor complete and accurate statements certified to be accurate by Licensee (or if a corporation, by an officer of Licensee), showing at

the minimum (i) one hundred percent (100%) of all gross amounts derived by Licensee from the Sale (as defined above) of each and every Licensed Product SKU hereunder, itemized by Licensed Product SKU and by description, together with the country in which manufactured and country in which sold or to which shipped; (ii) itemization of all allowable deductions, if any, in calculating the Net Sales for each Licensed Product; (iii) the Net Sales for each and every Licensed Product SKU; (iv) the amount of royalties due to Licensor with respect to such Net Sales; (v) credits for any payments made since the last royalty report rendered to Licensor hereunder; (vi) the balance payable; and (vii) such other pertinent information as Licensor may reasonably request from time to time. Such statements shall be furnished to Licensor whether or not any of the Licensed Articles have been sold during the quarter to which such statements refer. The form attached to this Agreement must be used for reporting royalties. Any sales in Puerto Rico are to be itemized separately on the royalty reporting forms. Upon demand of Licensor, Licensee shall, at its own expense, furnish to Licensor a detailed statement by an independent certified public accountant or an officer of Licensee, showing the number, country in which manufactured, country in which sold or to which shipped, description, gross sales price, itemized deductions from gross sales price and Net Sales price of the Licensed Articles distributed and/or sold by Licensee to the date of Licensor's demand.

(d) Royalty Payments. Royalties in excess of any advance payment required and paid hereunder shall be due on the thirtieth (30th) day of the month following the calendar quarter in which earned, and payment shall accompany the statements furnished as required above. The receipt or acceptance by Licensor of any of the statements furnished pursuant to this Agreement, or of any royalties paid hereunder (or the cashing of any royalty checks paid hereunder) shall not preclude Licensor from questioning the correctness thereof at any time within seven (7) years after the date of the transactions to be recorded, and in the event that any inconsistencies or mistakes are discovered in such statements or payments, they shall immediately be rectified and the appropriate payment made by Licensee. Licensee shall not be permitted to reduce royalty payments for any reason without prior written approval from Licensor. Licensee shall pay Licensor interest on a late royalty payment at an interest rate of one and three fourths percent (1.75%) per month, or the highest rate permitted by law, whichever rate is lower, from the date the royalty payment should have been received by Licensor until paid. Royalty payments must be remitted to Licensor at the address noted above.

3. NONEXCLUSIVITY

(a) Nothing in this Agreement shall be construed to prevent Licensor from granting any other licenses for the use of the Name or from utilizing the Name in any manner whatsoever.

(b) Without limiting the foregoing reservation, Licensor reserves all rights to use or license others to use and/or manufacture articles similar to the Licensed Articles provided that such articles do not infringe upon any patent rights of Licensee.

(c) It is further understood that, without limiting the foregoing reservations, (i) in accordance with prior terminated or expired license agreements relating to the use of the Licensed Property in connection with articles similar to the Licensed Articles in the Territory, Licensor reserves the right to permit licensee thereunder to sell-off such articles on hand or in process within the Territory during the Term, and (ii) third parties granted rights for such exploitation of the Licensed Property after the Term hereof may be granted permission to display proposed product at trade shows during the Term, and/or consult with retailers and other third

parties, with regard to development and manufacturing of such articles similar to the Licensed Articles.

4. GOOD WILL

Licensee recognizes the great value of the good will associated with the Name, and acknowledges that, as between Licensor and Licensee, all rights in the Name, including good will pertaining thereto, are exclusively the rights of Licensor, and that the Name has a secondary meaning in the mind of the public. Licensee further recognizes and acknowledges that a breach by Licensee of any of its covenants, agreements or undertakings hereunder with respect to use of the Name, legal marking requirements, quality standards, or ethical standards will cause Lucas Licensing, Ltd. or Licensor irreparable damage, which cannot be readily remedied in damages in an action at law, and may, in addition thereto, constitute an infringement of copyrights in or trademarks of the Name, thereby entitling Lucas Licensing, Ltd. or Licensor to equitable remedies, costs and reasonable attorney's fees. Notwithstanding anything herein to the contrary, Licensee hereby waives, and forever releases Licensor from, any and all claims, actions, and suits alleging that Licensor may have failed to adequately promote, advertise, or otherwise use or exploit the Name during or after the Term (such matters being entirely within Licensor's discretion), and Licensor shall be under no obligation to sell any products utilizing the Name at any time.

5. PROTECTION OF RIGHTS OF LUCAS LICENSING, LTD. AND LICENSOR

(a) Licensee agrees to assist Licensor and Lucas Licensing, Ltd. to the extent necessary or desirable in the procurement of any protection or to protect any of the rights of Licensor or Lucas Licensing, Ltd. to the Name, and Licensor or Lucas Licensing, Ltd., if either so desires, may commence or prosecute any claims or suits in its own name or in the name of Licensee, or join Licensee as a party thereto. Licensee shall notify Licensor in writing of any infringements or imitations by others of the Name on articles similar to those covered by this Agreement which may come to Licensee's attention, and as between Licensor and Licensee, Licensor shall have the sole right to determine whether or not any action shall be taken on account of any such infringements or imitations. Licensee shall not institute any suit or take any action on account of any such infringements or imitations, or otherwise institute any suit or take any action relating to the Name, without first obtaining the written consent of Licensor to do so.

(b) Except with Licensor's written consent, neither Licensee, its parent or any of its subsidiaries or affiliates, will register or attempt to register copyrights in any country or to register as a trademark, service mark, design patent or industrial design, any of the Licensed Articles, trademarks or derivations or adaptations thereof, or any word, symbol or design which is so similar thereto as to suggest association with or sponsorship by Licensor or Lucas Licensing, Ltd., or any of the subsidiaries of either. In the event of breach of the foregoing, Licensee agrees, at its expense and at Licensor's request, immediately to terminate the unauthorized registration activity and promptly to execute and deliver, or cause to be delivered to Licensor or Lucas Licensing, Ltd., as Licensor may direct, such assignments and other documents as Licensor may require to transfer to Lucas Licensing, Ltd. or Licensor all rights to the registrations, patents or applications involved.

6. INDEMNIFICATION BY LICENSEE AND PRODUCT LIABILITY INSURANCE

Licensee hereby indemnifies Licensor and Lucas Licensing, Ltd. and undertakes to defend Licensee and/or Licensor and Lucas Licensing, Ltd. against, and to hold Licensor and Lucas Licensing, Ltd. harmless from, any claims, suits, loss, damage and expense (including

reasonable counsel fees and costs, whether or not in connection with litigation) arising out of any sale or use of the Licensed Articles, or any use of the Name, or any design, logo, verbiage, trademark, personal name, patent, process, idea, method or device (including but not limited to infringement or violation of any copyrights, patents, trademark, trade secrets or other intellectual property or proprietary rights of any third party in connection with the Licensed Products, or libel, slander, or other forms of defamation, or plagiarism, piracy or unfair competition resulting from the alleged unauthorized use of materials), by Licensee in connection with the Licensed Articles, or any other alleged action by Licensee, including by not limited to activities of Licensee related to this Agreement or to any of the matters herein contained (including any breach or alleged breach by Licensee of any warranty, covenant or obligation contained in this Agreement), and also from any claims, suits, loss and damage arising out of strict liability for, or any actual or alleged defects in, the Licensed Articles, whether defects in, design, manufacture, or otherwise. Licensee shall be solely responsible for trademark searches, and clearance of the use, of any designs, logos, or verbiage which Licensee may use in conjunction with the Name on the Licensed Articles. Licensee agrees to give Licensor prompt written notice of any such claims or suits and to take any such corrective action as Licensor may require in its discretion, including but not limited to product recall and/or changes in product design. In the event of a claim, action, or suit alleging a defect in the design, manufacture, or otherwise in the Licensed Articles, or alleging strict liability for damages due to the Licensed Articles, Licensee agrees not to destroy or discard any engineering design records or safety testing records pertaining to the Licensed Articles. Licensee agrees that it will obtain, at its own expense, product liability insurance from a recognized insurance company, providing adequate product liability insurance protection (at least in the amount of Two Million United States Dollars (U.S. $2,000,000.00) combined single limit of Bodily Injury Liability and Property Damage Liability for each occurrence and Five Million United States Dollars (U.S. $5,000,000.00) in annual aggregate), naming Licensee as named insured and Lucas Licensing, Ltd. and Licensor as additional named insureds against any claims, suits, loss or damage arising out of any such actual or alleged defects in the Licensed Articles. As proof of such insurance, a certificate of insurance naming Lucas Licensing, Ltd. and Licensor as additional named insureds will be submitted to Licensor by Licensee for Licensor's prior approval before any Licensed Article is distributed or sold, and at the latest, within thirty (30) days after the date first written above. Licensor shall be entitled to a copy of the then-prevailing certificate of insurance, which shall be furnished Licensor by Licensee. As used in the first two sentences of this Paragraph 6, "Licensor" and Lucas Licensing, Ltd. shall include Licensor and Lucas Licensing, Ltd., as the case may be, the parent, subsidiaries, and affiliates thereof, and the officers, directors, agents and employees of each. The certificate of insurance shall include a provision to notify Licensor in writing, prior to the effective date, of any amendment or cancellation of such insurance before the expiration date thereof.

7. <u>MERCHANDISE AND MANUFACTURING STANDARDS</u>

(a) Quality of Merchandise. Licensee agrees that the Licensed Articles shall be of satisfactory quality sufficient to meet consumer expectations. The Licensed Articles will be of such style and appearance as to be appropriate for and suited to their exploitation to the best advantage and to the protection and enhancement of the Name and the good will pertaining thereto. Licensee warrants that the Licensed Articles will be designed, produced, sold and distributed in accordance with all applicable laws, rules and regulations in the Territory, and with the United States Federal Food, Drug and Cosmetic Act, the Federal Hazardous Substance Act

(FHSA), the Flammable Fabrics Act, the Consumers Products Safety Act, with all other state and local laws and regulations and with the ASTM Standard Consumer Safety Specifications on Toy Safety (Toy Manufacturers of America Voluntary Toy Safety Standard) and Licensor's Safety and Reliability Specifications (the "Specifications") (collectively, the "Acts and Standards").

(i) In order to insure that the Licensed Articles meet the above standards, Licensee shall, prior to the date of first distribution of the Licensed Articles, submit to Licensor a document (the "Quality Assurance Plan") which lists all of the applicable Acts and Standards governing the manufacture and sale of the Licensed Articles in the Territory as well as a detailed description of the tests to be conducted on the Licensed Articles by Licensee to ensure compliance with such Acts and Standards. Licensee shall also supply Licensor with written laboratory reports confirming that the Licensed Articles conform to the Acts and Standards included in the Quality Assurance Plan. Upon request by Licensor, Licensee shall provide Licensor with specific test data, and in any case Licensee agrees to maintain such reports and other safety testing records, as well as all engineering design records, for a period of not less than twenty (20) years.

Licensee shall submit its Quality Assurance Plan upon completion of the design (including the engineering design) of the Licensed Articles, prior to the creation of any new tooling, and prior to the manufacture and production of the Licensed Articles when no tooling is required. In any event, preproduction approval shall not be granted prior to approval of the Quality Assurance Plan and shall never be deemed to have been implied. Tests on Licensed Articles must be performed by a national testing laboratory or an independent laboratory that is nationally approved unless another laboratory is otherwise approved by Licensor.

(ii) To this end, Licensee shall, before selling and distributing any of the Licensed Articles, furnish to Licensor free of cost for its written approval, a reasonable number of samples of each Licensed Article, its cartons, containers and packing and wrapping material. The quality, content, and style of such Licensed Articles as well as of any carton, container or packing or wrapping material, shall be subject to the approval of Licensor, to be granted or withheld in Licensor's sole discretion. After samples have been approved pursuant to this paragraph, Licensee shall not depart therefrom in any material respect without Licensor's prior written consent, and Licensor shall not withdraw its approval of the approved samples except on sixty (60) days' prior written notice to Licensee, unless the same shall be defective or harmful, in which event, no such prior notice shall be required. In no event shall Licensor be liable for damages caused directly or indirectly by any such withdrawal of approval, including but not limited to claims for lost profits, consequential damages, or costs. Licensee shall, without charge, furnish Licensor with thirty-six (36) samples of each Licensed Article manufactured hereunder upon completion of the first production run thereof, and Licensee shall not distribute same until it receives Licensor's written approval. Any item submitted to Licensor shall not be deemed approved unless and until the same shall be approved by Licensor in writing. From time to time after Licensee has commenced selling the Licensed Articles, and upon Licensor's written request, Licensee shall furnish without cost to Licensor, not more than ten (10) additional random samples of each Licensed Article being manufactured or sold by Licensee hereunder, together with any cartons, containers and packing and wrapping material used in connection therewith. Should Licensor require additional Licensed Articles for any reason whatsoever, Licensor may purchase such at Licensee's cost. Sale of any Licensed Article by Licensee, the quality of which

has not been specifically approved by Licensor as hereinabove provided, shall be deemed to constitute a material breach of this Agreement.

(b) Manufacturing Ethics. Licensee acknowledges that Licensor has a significant interest in ensuring that the Licensed Articles are manufactured, distributed, and sold in accordance with the highest ethical and business standards, and Licensor shall have the right to inspect any manufacturing facilities owned or controlled by Licensee. Furthermore, Licensee confirms that its manufacturing facilities and those of any third party manufacturer of the Licensed Articles (as permitted under Paragraph 20 hereinbelow) strictly comply and will remain in strict compliance throughout the Term with Licensor's Global Business Ethics Principles (hereinafter, the "Principles"), attached hereto as Schedule B and incorporated herein by reference. Licensor shall have the right to amend such Principles, as well as the Specifications, from time to time, and such amended version shall be deemed incorporated herein by reference ten (10) days after notice to Licensee of such changes, absent Licensee's notice to Licensor of its formal written objections thereto within such time period (in the event that, after Licensee's objections, the parties are unable to agree as to the amendment of such Principles or Specifications within ten (10) days of the objection, Licensor shall have the right to terminate this Agreement under Paragraph 12 (a)).

(i) In order to assure Licensor of Licensee's compliance with the foregoing, within six (6) months of the execution of this Agreement, and within three (3) months of the execution of any third party Manufacturer's Agreement pursuant to Paragraph 20 hereinbelow, Licensee agrees to supply Licensor with a notarized certification as to such compliance substantially in the form of Exhibit 2, attached hereto.

(c) In the event that Licensee is contacted by any governmental body or agency (including but not limited to the United States Food and Drug Administration, Federal Trade Commission, Consumer Product Safety Commission, Federal Communications Commission, the U.S. Department of Justice, Health Canada, or any state attorney general's office) concerning any issue of product safety, product quality, allegedly false or deceptive trading or advertising practices, or an alleged failure to comply with governmental regulations or laws, Licensee shall so notify Licensor within twenty four (24) hours of such contact. Furthermore, except as may be otherwise required by law, Licensee agrees not to contact any such governmental body or agency, whether on Licensee's own volition or in response to any such inquiry, without first notifying Licensor and giving Licensor a right of meaningful consultation as to any such communication and/or response.

(d) Licensee agrees to provide Licensor with quarterly reports, within thirty (30) days of the end of each calendar quarter, describing all consumer complaints and/or quality-related inquiries or notifications related to the Licensed Articles, regardless of whether or not they concerned bodily or physical injury. It is further agreed that safety and/or potential safety complaints, inquiries, or notifications shall be reported by Licensee to Licensor within two (2) business days. All reports under this subparagraph shall be sent via regular mail, as well as facsimile transmittal (401-727-5883), to the attention of Licensor's Quality Assurance Department.

8. <u>TRADEMARK AND COPYRIGHT PROTECTION</u>

(a) Labeling. As a condition to the grant of the rights hereunder, Licensee agrees that it will cause the Required Notices to appear on or within each Licensed Article sold by it and on or within all packaging, cartons, wrapping material, advertising, promotional or display material bearing the Name.

(b) Approval. Each and every tag, label, storyboard, copy and layout imprint or other device containing any such notice, and all advertising, promotional or display material bearing the Name, shall be submitted by Licensee to Licensor for its written approval, as may be granted or withheld in Licensor's sole discretion, prior to use by Licensee. Approval by Licensor shall not constitute a waiver of Licensor's rights or Licensee's duties under any provision of this Agreement. Licensee must use Licensor's approval form with each submission for Licensor's approval. Otherwise, Licensor is not under any obligation to review Licensee's submission.

(c) Ownership. All right, title and interest in and to all copyrights and trademarks embodying the Name or derived from the creation, manufacture or sale by Licensee of the Licensed Articles, and all copyright and trademark registrations based thereon, shall be in the name of Lucas Licensing, Ltd. or Licensor, as Licensor may direct, and shall be owned exclusively by Lucas Licensing, Ltd. or Licensor, as the case may be, and Licensee covenants and agrees that this Agreement shall be deemed a license, not a transfer, of Licensor's rights in the Name, and that Licensee shall have no interest in or claim to the Name or to any of the copyrights and trademarks associated therewith, except to the limited extent of the license to use same pursuant to this Agreement, and subject to its terms and conditions. Licensee agrees not to utilize the Name or any other intellectual property to which Licensor has rights except as expressly permitted by this Agreement or pursuant to a separate license agreement. Licensee further agrees to provide Licensor with the date of the first use of the Licensed Articles in interstate and in intrastate commerce and to execute, and provide Licensor with, all necessary documents, assignments and signatures which Licensor may request for the purpose of perfecting the title of Lucas Licensing, Ltd. or Licensor, as Licensor may direct, to all such copyright and trademark registrations. Licensee agrees to secure assignments of all rights which any third party designers of the Licensed Articles or related materials may otherwise claim. All uses of the trademarks by Licensee hereunder shall inure to the benefit of Lucas Licensing, Ltd. or Licensor, as the case may be. Without limiting the foregoing, Licensee hereby assigns to Lucas Licensing, Ltd. or Licensor, as Licensor may direct, all copyrights and trademarks in the Licensed Articles and the Name, together with the good will attaching to that part of the business in connection with which the trademarks are used. Licensee agrees that, upon request of Licensor, it shall provide Licensor with copies, in such format as Licensor may reasonably request (including but not limited to digitized copies downloaded onto a floppy disc), of all artwork utilizing the Name. Licensee shall follow Licensor's instructions for proper use of the Name in order that protection and/or registrations for the trademarks may be obtained or maintained. Notwithstanding the foregoing, Licensor and Lucas Licensing acknowledge that they claim no ownership in trademarks, copyrights and design rights that Licensee demonstrably owned prior to the date of this Agreement or, if earlier, the date of the first use of the same in connection with the Name.

9. <u>PROMOTIONAL MATERIAL</u>

(a) In all cases where Licensee desires artwork involving Licensed Articles to be executed, the cost of such artwork and the time for the production thereof shall be borne by Licensee. All artwork and designs involving the Name, or any reproduction thereof, shall be subject to prior written approval of Licensor, to be granted or withheld in Licensor's sole discretion.

(b) Licensor shall have the right, but shall not be under any obligation, to use the Name and/or the name of Licensee so as to give the Name, Licensee, Licensor, Lucas Licensing, Ltd. and/or the programs of Lucas Licensing, Ltd. or Licensor full and favorable prominence and publicity.

(c) Licensee agrees not to offer for sale or advertise or publicize any of the Licensed Articles on radio, broadcast, print or television without the prior written approval of Licensor. Licensee also agrees to submit to Licensor for advance approval designed sketches of all advertising and other publicity material which Licensee proposes to use in connection with the promotion and sale of the Licensed Articles.

10. <u>DISTRIBUTION</u>

(a) Licensee agrees that it will commence sales of the Licensed Articles by the Initial On-Sale Date, and that during the Term of this license it will diligently manufacture, distribute, and sell the Licensed Articles in Substantial Quantities and that it will make and maintain proper and adequate arrangements for the distribution of the Licensed Articles. For purposes of this Agreement, "Substantial Quantities" shall mean sufficient quantities to meet at least Licensee's average order level for its regular distributors and/or customers for similar articles of the type licensed hereunder.

(b) Licensee agrees that it will sell and distribute the Licensed Articles outright at a competitive price, in accordance with the provisions of the Sublicense Agreement Summary, and with respect to the United States, Canada, and their respective territories and possessions, Mexico and Latin America only, at not more than the price generally and customarily charged the trade by Licensee (the foregoing specifically does not apply to sales within the European Union),, and not on an approval, consignment or sale or return basis, and, to the extent the following prohibition is permitted by local laws, only within the Channels of Distribution to jobbers, wholesalers and distributors for sale and distribution to retail stores and merchants, and to retail stores and merchants for sale and distribution direct to the public, and as otherwise may be specifically permitted under Paragraph 1(b) above. Licensee shall not sell or distribute Licensed Articles to anyone whose sales or distribution are or will be made for publicity or promotional tie-in purposes, combination sales, premiums, give-aways, or similar methods of merchandising, or who engages in deceptive, illegal, or immoral business practices. For purposes of this paragraph, the term "premium" shall include, but not be limited to, free or self-liquidating items offered to the public in conjunction with the sale or promotion of a product or service, or any similar scheme or device, the prime intent of which is to use the Licensed Articles in such a way as to promote, publicize and/or sell services and/or other product(s). Licensee is expressly prohibited from making door to door sales. In the event any sale is made at a special price to any of Licensee's subsidiaries or to any other person, firm or corporation related in any manner to Licensee or its officers, directors or major stockholders, there shall be a royalty paid on such sales based upon the price generally charged the trade by Licensee.

11. <u>RECORDS</u>

Licensee agrees to keep accurate books of account and records covering all transactions relating to the license hereby granted, and Licensor and its duly authorized representatives shall have the right at all reasonable hours of the day to an inspection of said books of account, records, customer lists, record retention and/or document destruction policies, and all other documents, materials, and premises in the possession or under the control of Licensee with respect to the subject matter and terms of this Agreement, and shall have free and full use thereof and access thereto for all customary business purposes and for the purpose of making extracts therefrom and ensuring Licensor of Licensee's compliance with the terms of this Agreement. All books of account and records shall be kept available for at least seven (7) years

after the date of the transactions to be recorded. In the event that Licensor's duly authorized representatives shall discover a discrepancy of five percent (5%) or more pursuant to any such examination, Licensee shall pay to Licensor the fee for such examination, plus out-of-pocket costs. The fee for said examination shall be One Thousand United States Dollars (U.S. $1,000.00) per day, but in no event shall Licensee be charged in excess of Four Thousand United States Dollars (U.S. $4,000.00) for any individual examination. Royalties found to be due as a result of Licensor's examination of Licensee's books of accounts should be paid immediately with interest at an interest rate of one and three fourths percent (1.75%) per month, or the highest rate permitted by law, whichever rate is lower, from the date the royalty amount should have been paid to Licensor until paid.

12. TERMINATION

(a) If Licensee shall not have commenced in good faith to manufacture and distribute in Substantial Quantities all the Licensed Articles by the Initial On Sale Date, or if at any time thereafter in any calendar quarter Licensee fails to sell any of the Licensed Articles (or any class or category of the Licensed Articles), or the parties are unable to agree on changes to the Principles or Specifications as described in Paragraph 7(b), Licensor may terminate this license with respect to any Licensed Articles or class or category thereof which have not been manufactured and distributed during such calendar quarter by giving notice of termination to Licensee. Such notice shall be effective when mailed by Licensor.

(b) If Licensee becomes insolvent, or if a petition in bankruptcy or for reorganization is filed by or against it, or if any insolvency proceedings are instituted by or against it under any state or federal law, or if it makes an assignment for the benefit of its creditors, or if a receiver is appointed for its property and business and remains undischarged for a period of fifteen (15) days, or if it liquidates its business in any manner whatsoever, or if any distress, execution or attachment is levied on any of its assets and remains undischarged for a period of fifteen (15) days, or if Licensee abandons the manufacture of the Licensed Articles, Licensor shall have the right, if it so elects, to terminate this Agreement and the license hereby granted, upon ten (10) days' notice in writing to Licensee. Upon the expiration of such ten (10) days, this Agreement and the license hereby granted shall cease and terminate.

(c) If Licensee shall violate any of its other obligations under the terms of this Agreement, and each of such obligations shall be deemed to be material, Licensor shall have the right to terminate the license hereby granted (i) upon ten (10) days' notice in writing with respect to any such violation of any Royalty, Royalty Guarantee or other payment obligations or any such violation of Paragraphs 7, 8 and 9, or (ii) upon twenty (20) days' notice in writing with respect to any such violation of the other obligations of Licensee, and such notice of termination shall become effective unless Licensee shall completely remedy the violation within the ten (10)-day period or twenty (20)-day period (as applicable) and satisfy Licensor that such violation has been remedied.

(d) Termination of the license under the provisions of Paragraph 12 shall be without prejudice to any rights which Licensor may otherwise have against Licensee, including the right to recover royalties due hereunder or damages caused it by Licensee's breach. Upon the termination of this license, notwithstanding anything to the contrary herein, all royalties on sales theretofore made, all unpaid advances, and all minimum guarantee balances shall become immediately due and payable, and shall not be repayable.

(e) Licensee's material breach of the terms of any other agreements which it may have, now or in the future, with Licensor or its affiliates shall be deemed a material breach of this Agreement as well.

13. FINAL STATEMENT UPON TERMINATION OR EXPIRATION

Sixty (60) days before the expiration of this license and again, within ten (10) days after such expiration (or, in the event of termination of this license, ten (10) days after receipt of notice of termination or the happening of the event which terminates this Agreement where no notice is required), Licensee shall furnish to Licensor a statement showing the number and description of articles covered by this Agreement on hand or in process. Licensor shall have the right to take a physical inventory to ascertain or verify such inventory and statement, and refusal by Licensee to submit to such physical inventory by Licensor shall forfeit Licensee's right to dispose of such inventory as provided in Paragraph 14 hereof, Licensor retaining all other legal and equitable rights Licensor may have in the circumstances.

14. DISPOSAL OF STOCK UPON EXPIRATION

After expiration of this Agreement, Licensee, except as otherwise provided in this Agreement, may dispose of Licensed Articles which are completed and on hand at the time of expiration for a period of sixty (60) days (the "Sell-Off Period"), provided that (i) advances and royalties with respect to that period are paid and statements are furnished for that period in accordance with Paragraph 2, (ii) the Licensed Articles had been offered for sale and shipped prior to the expiration of the Term, and (iii) such sales are restricted to the Territory and Channels of Distribution. Notwithstanding anything to the contrary herein, Licensee shall not manufacture, sell or dispose of any Licensed Articles after termination hereof based on the failure of Licensee to affix notice of copyright, trademark, or service mark as specified above, or because of the departure by Licensee from the quality and style approved by Licensor pursuant to Paragraph 7, or by reason of termination for any other causes set forth in Paragraph 12 above. In the event of such termination by Licensor by reason of any cause contained in Paragraph 12, Licensee, its receivers, representatives, trustees, agents, administrators and successors shall have no further right to sell, exploit or in any way deal in or with any of the Licensed Articles, or any advertising matter, packing material, boxes, cartons or other documentation relating thereto.

Throughout the Term and any Sell-Off Period, Licensee agrees to refrain from "dumping" the Licensed Articles in the market place. "Dumping" shall mean the distribution of Licensed Articles at volume levels significantly above Licensee's immediately preceding sales levels with respect to the Licensed Articles and at price levels so far below prior levels and/or industry norms (including but not limited to sales below cost) with respect to the Licensed Articles as to disparage and/or devalue the Licensed Property. The foregoing restriction is not applicable if, and only to the extent that, it is prohibited under any European laws. Nothing herein shall be construed as granting Licensor the right to set or approve Licensee's pricing, and nothing shall be deemed to restrict Licensee's ability to set prices in its own unfettered discretion.

15. EFFECT OF TERMINATION OR EXPIRATION

Upon and after the expiration or termination of this license, all rights granted to Licensee hereunder shall forthwith revert to Licensor, and Licensee will refrain from further use of the Name or any further reference to it, direct or indirect, or anything deemed by Licensor to be similar to the Name in connection with the manufacture, sale or distribution of Licensee's products, except as provided in Paragraph 14.

16. LICENSOR'S REMEDIES

(a) Licensee acknowledges that its failure (except as otherwise provided herein) to commence in good faith to manufacture, distribute and sell in Substantial Quantities any one or more of the Licensed Articles by the Initial On Sale Date, and to continue during the Term hereof to diligently and continuously manufacture, distribute and sell the Licensed Articles or any class or category thereof, will result in immediate damages to Licensor.

(b) Licensee acknowledges that its failure (except as otherwise provided herein) to cease the manufacture, sale or distribution of the Licensed Articles or any class or category thereof at the termination or expiration of this Agreement will result in immediate and irremediable damage to Licensor and to the rights of any subsequent licensee. Licensee acknowledges and admits that there is no adequate remedy at law for such failure to cease manufacture, sale or distribution, and Licensee agrees that in the event of such failure, Licensor shall be entitled to equitable relief by way of temporary and permanent injunctions and such other further relief as any court with jurisdiction may deem just and proper.

(c) Resort to any remedies referred to in this Agreement shall not be construed as a waiver of any other rights and remedies to which Licensor is entitled under this Agreement or otherwise.

17. EXCUSE FOR NONPERFORMANCE

Licensee shall be released from its obligations hereunder and this license shall terminate in the event that governmental regulations or other causes arising out of a state of national emergency or war or causes beyond the control of the parties render performance impossible (herein any such event to be referred to as a "Force Majeure Event"), and one party so informs the other in writing of such causes and its desire to be so released. In such events, all royalties on sales theretofore made shall become immediately due and payable, and no advance or minimum royalties shall be repayable.

18. NOTICES

All notices and statements to be given, and all payments to be made hereunder shall be given or made at the respective addresses of the parties as set forth above, unless notification of change of address is given in writing and the date of mailing shall be deemed the date the notice or statement is given.

19. NO JOINT VENTURE

Nothing herein contained shall be construed to constitute the parties joint venturers, nor shall any similar relationship be deemed to exist between them. Nothing herein contained shall be construed as constituting Licensee as Licensor's agent or as authorizing Licensee to incur financial or other obligations in Licensor's name, and it is specifically understood and agreed that under no circumstances shall any power granted, or which may be deemed to be granted to Licensee, be deemed to be coupled with an interest. It is specifically understood that the rights and powers retained by Licensor to supervise or otherwise intervene in Licensee's activities and to determine all matters of policy, all as hereinabove provided, are retained because of the necessity of protecting the copyrights, trademarks, properties and property rights generally in the Name, and specifically to conserve the good will and good name of Licensor's company, Lucas Licensing, Ltd. and of the Name.

20. NO ASSIGNMENT OR SUBLICENSE BY LICENSEE

This Agreement and all rights and duties hereunder are personal to Licensee and shall not, without the written consent of Licensor, be assigned, mortgaged, sublicensed or otherwise encumbered by Licensee or by operation of law. For purposes of this Agreement, the

term "assignment" shall, in addition to the transfer of this Agreement or the rights or obligations thereunder, whether voluntarily, involuntarily, by operation of law or otherwise, be deemed to include (i) a sale or other transfer by Licensee of all or substantially all of its assets; (ii) the liquidation or dissolution of Licensee; (iii) the merger, amalgamation, consolidation or reorganization of Licensee into or with another corporation or other entity as a result of which Licensee is not the surviving corporation; or (iv) any transaction (including any of the foregoing transactions, as well as any in which Licensee is the surviving corporation) which, whether by way of sale, gift or other transfer, whether involving Licensee or the record or beneficial owners of equity interests in Licensee, results in more than a twenty percent (20%) change in the voting control of Licensee. Licensee shall not be entitled to sublicense any of its rights under this Agreement, except that, in the event Licensee is not a manufacturer of the Licensed Articles, Licensee may, subject to the prior written approval of Licensor, utilize a third-party manufacturer in connection with the manufacture and production of the Licensed Articles, provided that such manufacturer shall execute (i) a Manufacturer's Agreement in the form of Exhibit 1 attached hereto and made a part hereof, and (ii) execute an Approval of Manufacturer Agreement in the form of Exhibit F attached hereto and made a part hereof. In such event and in the event of any permitted assignment, Licensee shall remain primarily obligated under all of the provisions of this Agreement. In no event shall any sublicense agreement include the right to grant any further sublicenses.

21. <u>INTEGRATION</u>

No waiver or modification of any of the terms of this Agreement shall be valid unless in writing and signed by the party to be charged. No waiver by either party of a breach or default hereunder, or a continuing breach or default, shall be deemed a waiver by such party of a subsequent breach or default of like or similar nature. Any approval or consent given by Licensor shall not constitute a waiver of any of Licensor's rights or Licensee's duties under any provision of this Agreement. There are no representations, promises, warranties, covenants or undertakings other than those contained in this Agreement, which represents the entire understanding of the parties. No person, firm, group or corporation (whether included in the Name or otherwise), other than Licensee and Licensor, shall be deemed to have acquired any rights by reason of anything contained in this Agreement, except as provided in Paragraphs 5 and 20 and in Attachment A to the Sublicense Agreement Summary.

22. <u>GOVERNING LAW</u>

This Agreement shall be construed in accordance with the federal laws of the United States and the laws of the State of California applicable to agreements entered into, and to be performed entirely, within California between California residents (and excluding the United Nations Convention on Contracts for the International Sale of Goods) without regard to choice of law provisions and regardless of the place or places of its actual execution or performance. Any suit, action or proceeding between or among any of the parties hereto arising out of or related to this Agreement will be brought solely in the federal or state courts in the Northern District of California, or at Licensor's election, the State of Rhode Island, and Licensee hereby submits to the personal jurisdiction thereof and agrees to such courts as the appropriate venue. Process in any action or proceeding referenced to in this Paragraph may be served on Licensee at the address set forth in the Sublicense Agreement Summary.

23. <u>HEADINGS</u>

The paragraph and other headings in this Agreement are for reference purposes only and will not affect the meaning or interpretation of this Agreement.

24. SEVERABILITY

In the event that any provision(s) of this Agreement is adjudicated by a court of competent jurisdiction to be unlawful, unenforceable, invalid, and/or unconscionable, that provision(s) shall be deemed severed from this Agreement and shall not affect the validity or enforceability of the remaining provisions hereof or this Agreement as a whole.

25. SURVIVAL

The provisions of Paragraphs 2, 4, 5, 6, 7(c) and (d), 8(c), 11, 12(d), 13, 14, 15, 16(b) and (c), 22, 23, and 24, as well as those on the Sublicense Agreement Summary and Attachment A thereto, (each where appropriate), shall survive the termination or expiration of this Agreement.

-END-

# APPROVAL OF SUBLICENSEE AGREEMENT

THIS AGREEMENT dated as of October 28, 2004, is made by and among LUCAS LICENSING LTD., a California corporation, P.O. Box 2009, San Rafael, California 94912, U.S.A. (hereinafter referred to as "Licensor"), OVERBREAK, LLC, 9420 Chivers Avenue, Sun Valley, California 91352 (hereinafter referred to as "Company") and HASBRO, INC., HASBRO INTERNATIONAL, INC. and all "Permitted Licensee Affiliates" (as defined in the License Agreement) jointly and severally "Licensee"), 1027 Newport Avenue, Pawtucket, Rhode Island 02862-1059.

WHEREAS: Reference is made to that certain license agreement between Licensor and Hasbro, Inc., Hasbro International and all, "Permitted Licensee Affiliates" (as defined in the License Agreement) jointly and severally "Licensee") (the License Agreement), pursuant to which License Agreement Licensee is licensed the right to distribute and sell, subject to the terms and conditions of the License Agreement, certain products, goods or articles governed thereby (the "Licensed Products") based on the "Licensed Property" (as defined therein); and

WHEREAS: Company and Licensee have entered into an agreement dated as of October 28, 2004 (the "Sublicense Agreement"), whereby Licensee has sublicensed to Sublicensee the right to distribute and/or sell certain Licensed Products based on or incorporating the Licensed Property in the country or countries set forth therein (the "Territory") and for a term set forth in the Sublicense Agreement;

NOW, THEREFORE, for the promises set forth herein by the parties and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1. RESPONSIBILITY OF LICENSEE. Subject to the terms and conditions of the License Agreement, nothing contained in this Agreement or in the Sublicense Agreement shall in any manner whatsoever affect or otherwise diminish or relieve Licensee of any of its obligations under the License Agreement.

2. SUBLICENSE AGREEMENT: In order to induce Licensor to execute this Agreement, Licensee and Company hereby represent and agree that, subject to the approval of Licensor, Company has executed the Sublicense Agreement. A copy of such Sublicense Agreement is attached hereto as Attachment B-1 and is incorporated herein by this reference. Without limitation of Licensor's rights, if Company breaches a material term of the Sublicense Agreement and as a result of such breach, Licensee is in material breach of the License Agreement, subject to the provisions of Subparagraph 22.2(a) of the License Agreement, then, notwithstanding anything to the contrary contained in the Sublicense Agreement, Licensor shall have the right, pursuant to the License Agreement to send to Company a notice of termination ("Termination Notice") in the name of Licensee and the Sublicense Agreement shall be deemed terminated as of the date Company receives such Termination Notice.

3. APPROVAL BY LICENSOR: Subject to the terms and conditions hereof, Licensor hereby approves Company to act for Licensee as a sublicensee of the rights and obligations of Licensee solely with respect to the sale and distribution of Licensed Products governed by the Sublicense Agreement. It is expressly understood and agreed that the rights sublicensed hereunder do not include the right to manufacture of Licensed Products for which Company must, with Licensor's prior written approval, execute an Approval of Manufacturer Agreement in accordance with the terms and conditions of the License Agreement.

4. ACKNOWLEDGMENT OF LICENSE AGREEMENT: Company hereby represents that Company has reviewed and is familiar with all of the provisions of the License Agreement identified in Subparagraph 8.3 of the License Agreement as being relevant to Company's activities hereunder, and Company agrees that in performing under this Agreement, Company shall perform, be bound by and comply with each and all of

such terms and conditions of the License Agreement as they apply to Company. Without limitation of Licensor's rights and remedies, in the event of a breach or threatened breach by Licensee of any term or condition of the License Agreement and/or in the event of a breach or threatened breach by Company of any term or condition of the Sublicense Agreement that would result in a breach of Licensee's obligations pursuant to the License Agreement, Licensor shall be entitled to seek legal and/or equitable relief by way of injunction or otherwise against Licensee and/or against Company, at the discretion of Licensor, to restrain, enjoin and/or prevent any such breach or threatened breach.

5. OBLIGATIONS OF COMPANY: Company hereby agrees that in exercising the rights authorized herein:

(a) Company shall only distribute and/or sell a Licensed Product pursuant to the Sublicense Agreement in accordance with the instructions of Licensee;

(b) Except as provided in Subparagraph 10(a) herein below, Company shall not assign or license, in any manner whatsoever, the rights granted to Company herein or delegate any of its obligations under the Sublicense Agreement or under this Agreement to any party;

(c) Company shall execute a Trademark License Agreement with Licensor, or with any entity designated by Licensor, with respect to the Licensed Products in a form substantially identical to the Trademark License Agreement executed by Licensee with respect to the Licensed Products; and

(d) Without limitation of Licensor's rights hereunder, Company shall upon execution of the Sublicense Agreement and of this Agreement assume all of Licensee's obligations with respect to rights sublicensed in the Sublicense Agreement for the Licensed Products governed thereby.

6. EFFECT OF EXPIRATION OR TERMINATION: Without limitation, upon the expiration or earlier termination of the Sublicense Agreement, Company shall comply with and be bound by the terms and conditions as are imposed upon Licensee pursuant to subparagraph 22.3 of the License Agreement and (a) immediately cease all activities authorized hereunder respecting the Licensed Products including, without limitation, the distribution and sale of Licensed Products and, within thirty (30) days after such expiration or termination, Company shall send Licensor and Licensee a complete inventory report of all Licensed Products within its possession or control; and (b) at Licensor's election, either (i) deliver to Licensor any or all Production Materials; or (ii) furnish Licensor with a sworn certificate of destruction of such Production Materials, signed by an officer of Company. Upon the expiration or termination of the Sublicense Agreement, including a sell-off period thereunder, if any, except as otherwise expressly provided herein, Company shall have no further right to exercise the rights sublicensed hereunder or otherwise acquired in relation to this Agreement or the Sublicense Agreement.

7. COMPANY RECORDS AND AUDITS:

(a) Company will maintain complete and accurate records during and for five (5) years after the termination or expiration of the Sublicense Agreement, related to this Agreement and/or the rights sublicensed pursuant to the Sublicense Agreement. The obligation to maintain records and to grant Licensor and Licensor's representatives access to such records shall survive the expiration or earlier termination of this Agreement.

(b) An independent certified public accountant selected by Licensor may, upon reasonable notice and during normal business hours, inspect any and all records of Company related to the exercise of Company's rights under this Agreement and/or the Sublicense Agreement, including without limitation its payment obligations. If, upon performing such audit, it is determined that Company owes Licensor monies, Company will immediately make full payment thereof. If the amount of such payment exceeds Five Thousand Dollars

(U.S.$ 5,000.00), Company will bear all out-of-pocket expenses and costs of such audit in addition to its obligation to make full payment. All underpayments and late payments will accrue interest charges from the due date through the date of payment at an interest rate equal to three percent (3%) over the prime lending rate set by the Bank of America N.T.S.A., or the maximum legal rate, if such maximum legal rate is lower, and shall be payable upon demand.

8. LICENSOR AS THIRD PARTY BENEFICIARY. In addition to Licensor's other rights and remedies pursuant to the License Agreement and to this Agreement, Licensor is a third party beneficiary of the obligations of Company under any and all agreements, whether oral or written, between Company and Licensee respecting the Licensed Products, including, without limitation, the Sublicense Agreement, and Licensor shall have the right at any time to enforce such obligations related to the Licensed Property and to exercise any of Licensee's rights and remedies directly against Company as if Licensor were a direct party thereto if Licensee fails to enforce such obligations or to exercise any such rights or remedies within twenty-five (25) days following Licensee's receipt of Licensor's written request therefor.

9. CONFIDENTIALITY.

(a) Confidential Information. Company acknowledges and agrees that the terms and conditions contained in this Agreement, the Sublicense Agreement and/or any other agreement between or among any or all of the parties are confidential, as well as any and all information and material concerning or pertaining to: (i) any script, concept, marketing plan, schedule of Licensor or of any Licensor-Related Entity (including, without limitation, any pre-production, production or post-production schedule or release schedule for any "Prequel" [as defined in the License Agreement] or for any derivative work thereof); (ii) any project, product, good or article pertaining to the Licensed Property; (iii) any term or condition of any agreement between Licensor and any individual or entity relating to any Licensed Product (including, without limitation, any talent agreement); and (iv) any "Copyright Material" (as such term is defined in the License Agreement) are confidential and proprietary to Licensor (individually and collectively the "Confidential Information"). Company further acknowledges and agrees that, except as otherwise expressly provided in this Subparagraph 10(a), Company shall not use, copy, or disclose, or authorize or permit the use, copy or disclosure of, any Confidential Information in whole or in part in any manner or to any person, firm, enterprise, organization, corporation or entity unless authorized in advance in writing by Licensor. Company shall receive and hold, and shall contractually obligate and cause all entities with whom it contracts relative to the Licensed Products to maintain, all Confidential Information in the strictest confidence and Company acknowledges, represents, warrants and agrees to use its best efforts to protect the confidentiality of all Confidential Information. Furthermore, Company will not disclose any Confidential Information to any third party for any purpose (including the exercise of its rights or performance of its obligations) unless Licensor otherwise agrees in writing and such third party has executed a written confidentiality agreement in form and substance acceptable to Licensor, which confidentiality agreement, *inter alia*, shall restrict the use of any Confidential Information to the minimal extent necessary to effectuate the terms and conditions of this Agreement as they apply to such third party and requires such third party to use its best efforts to maintain all Confidential Information in the strictest confidence Company's obligations pursuant to this Subparagraph 9(a) shall not apply to any Confidential Information which: is authorized in writing by Licensor to become publicly known; is rightfully received from a third party authorized by Licensor to receive such information without restriction and without breach of this Agreement; or is the minimum necessary to comply with any law, regulation, stock exchange rule or valid order of a court of competent jurisdiction.

(b) Publicity or Announcements. Without limitation of the foregoing, except to the minimum extent necessary to comply with any law, regulation or stock exchange rule, no announcements, press releases, or publicity about the existence or any terms of this Agreement, the relationship of the parties or about the

rights relating to the Licensed Products to be exercised hereunder shall be made by Company without the prior written approval of Licensor in each instance.

(c) Rights of Publicity. Except as expressly set forth herein, Company acquires no rights to use and will not use without Licensor's prior written approval the characters, artwork, designs, trade names, copyrighted materials, trademarks or service marks of Licensor in any advertising, publicity or promotion, to express or imply any endorsement by Licensor of Company's services or products, or in any other manner except as expressly authorized in this Agreement. The foregoing provision shall survive expiration or termination of this Agreement.

10. GENERAL.

(a) Assignment. This Agreement will bind and inure to the benefit of each party and to their respective successors and assigns. Company shall not voluntarily or by operation of law assign, sub-license, transfer, encumber or otherwise dispose of all or part of any right or privilege granted to Company in this Agreement, without Licensor's prior written approval. For purposes of this Paragraph, any change in control of Company, whether through merger, acquisition, reorganization, liquidation, foreclosure, involuntary sale in bankruptcy, or the purchase of substantially all of Company's assets or otherwise, shall be deemed a purported assignment subject to Licensor's prior written approval. Any attempted assignment, sublicense, transfer, encumbrance or other disposal without such approval will be null and void and constitute a material default and material breach of this Agreement.

(b) Governing Law. This Agreement will be governed by and construed in accordance with the laws of the federal laws of the United States and the laws of the State of California applicable to agreements executed, and to be performed entirely, within California between California residents (and excluding the United Nations Convention on Contracts for the International Sale of Goods) without regard to choice of provisions and regardless of the place or places of its actual execution and performance. Any suit, action or proceeding between or among the parties hereto arising out of or related to this Agreement will be brought solely in the federal or state courts in the Northern District of California, and Company hereby submits to the personal jurisdiction thereof and agrees to such courts as the appropriate venue. Notwithstanding the foregoing, Company agrees that, for purposes of collecting monies due pursuant to this Agreement, Company, at Licensor's election, may be subject to whatever local laws and courts have jurisdiction in any country of the Territory over Company.

(c) Attorneys' Fees. In the event of any legal proceeding between or among any of the parties hereto arising out of or related to this Agreement, the prevailing party shall be entitled to recover, in addition to any other relief awarded or granted, its costs and expenses (whether or not in connection with litigation and including, without limitation, reasonable attorneys' fees and costs) incurred in connection with any such proceeding.

(d) Equitable Relief. Company recognizes and acknowledges that a breach by Company of any covenants, agreements or undertakings made or assumed by it hereunder or under the Sublicense Agreement will cause Licensor irreparable damage, which cannot be readily remedied in damage, in an action at law, and may, in addition thereto, constitute an infringement of Licensor's intellectual property and other rights in the Licensed Property, thereby entitling Licensor to equitable remedies (including, without limitation, injunctive relief), reasonable costs (including, without limitation, whether or not in connection with litigation) and reasonable attorney's.

(e) Notices. All notices and approvals under this Agreement will be deemed received when delivered personally, sent by confirmed facsimile transmission or received through nationally-recognized express courier, to the address shown below or as may otherwise be specified by either part to the other in accordance with this Subparagraph 10(e). All such notices to Licensor will be directed as follows:

For notices to Licensor: P. O. Box 2009, San Rafael, CA 94903,
Attention: Vice President, Licensing, with a courtesy copy to: General Counsel.

For notices to Company: 9420 Chivers Avenue, Sun Valley, California 91352

(f) No Waiver. No waiver by either party, whether express or implied, of any provision of this Agreement or any breach thereof, and no failure of either party to exercise or enforce any of its rights under this Agreement, will constitute a continuing waiver with respect to such provision or right or as a breach or waiver or any other provision or right, whether or not similar.

(g) Severability. This Agreement is severable. If any provision of this Agreement is found invalid or unenforceable, that provision will be enforced to the maximum extent permissible, and the other remaining provisions of this Agreement will not be affected and shall remain in force.

(h) Approvals. Any and all approvals of Licensor permitted, rendered or required pursuant to this Agreement may be given or withheld by Licensor in the manner provided in the License Agreement.

(i) Headings Captions and Definitions. The name of this Agreement, and all headings and captions herein contained are for reference and convenience only and do not define, limit or expand the scope or intent of any provision hereof and shall not be relied upon in or in connection with the construction or interpretation of this Agreement. Except as herein otherwise expressly defined, all capitalized terms contained in this Agreement shall have the same meaning as such words have in the License Agreement. The words "herein," "hereunder" and similar terms refer to this entire Agreement and shall not be limited to the specific paragraphs or subparagraph in which they are used.

(j) Counterparts. This Agreement may be executed in one or more counterparts, and by telefacsimile transmission, each copy of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument, but this Agreement shall not be binding upon the parties until it has been signed by all parties hereto. The parties hereto agree that telecopied signatures hereto shall be effective and enforceable.

(k) Further Instruments: Except as otherwise expressly provided in this Agreement, each party shall furnish to the others (and shall deliver and cause to be executed, acknowledged and delivered to the other) any further instruments, which any such other party may reasonably require or deem necessary from time to time to evidence, establish, protect, enforce, defend or secure to such other party any or all of its rights hereunder or to more effectuate or carry out the purposes, provisions or intent of this Agreement.

(1) Entire Agreement. This Agreement constitutes the complete and entire agreement by and among all of the parties with respect to the subject matter hereof, superseding and replacing any and all prior agreements, negotiations, communications, and understandings (both written and oral) by and among all of the parties regarding such subject matter. This Agreement may only be modified, or any rights under it waived, by a written document executed by all parties. By signing in the spaces provided below, the parties hereto have accepted and agreed to all of the terms and conditions set forth above.

**LUCAS LICENSING LTD. ("Licensor")**

**By:**______________________________

**Its:**______________________________

**THE FOREGOING IS ACCEPTED AND AGREED TO:**

**OVERBREAK, LLC ("Company")**

**By:**______________________________

**Title:** President

**HASBRO, INC., on behalf of itself and all "Permitted Licensee Affiliates" (as defined in the License Agreement) ("Licensee")**

**By:** JANE RITSON-PARSONS

**Title:** President
Hasbro Properties Group
HASBRO, INC.

APR 1 2 2005